838

J.C. PENNEY CO., INC., APPELLANT AND CROSS-APPELLEE,
V. LANCASTER COUNTY BOARD OF EQUALIZATION, APPELLEE
AND CROSS-APPELLANT.
578 N.W. 2d 465

Filed April 21, 1998. No. A-97-778.

Jerry M. Slusky, of Gross & Welch, P.C., for appellant.

Gary E. Lacey, Lancaster County Attorney, and Michael E. Thew for appellee.

HANNON, SIEVERS, and MUES, Judges.

SIEVERS, Judge.

## INTRODUCTION

J.C. Penney Co., Inc., appeals the order of the Nebraska Tax Equalization and Review Commission (Commission) which upheld the valuation of the Lancaster County Board of Equalization (Board) of $8,685,000 for property tax purposes of the J.C. Penney department store in Lincoln's Gateway Shopping Center.

## BACKGROUND

J.C. Penney, a nationally known retail department store chain, owns commercial real property located in the city of Lincoln, Lancaster County, Nebraska. Construction on this property of a 125,870-square-foot anchor department store at the Gateway Shopping Center began in 1994 and was completed on March 6, 1995. The land upon which the store sits was purchased by J.C. Penney in 1994 for $2,267,000.

For the 1996 tax year, the county assessor proposed to value the subject property at $9,007,973. This figure was calculated using the cost method of valuation. The cost method involves using a computer program which first takes into consideration the characteristics of the subject property, such as the perimeter of the building, its area, and its height. After this data is compiled, the computer "uses electronic modeling and tables that estimate the cost of construction of a building with those [features]." Based on this figure, the computer estimates a sug-

gested value for the subject property, which is called the "replacement cost." The computer then adds the value of the land to the replacement cost to get the final appraised value. Using this method, the subject property was valued at $9,007,973. As a method of confirming this value, the county assessor's office used another method—the income valuation approach. This method also uses a computer program which estimates the income value of the property based upon averages for retail rental rates, less the estimated average for expenses that would be expected to be charged against a building. Using the income valuation approach, the subject property was valued higher, at $10,315,500.

On June 16, 1996, J.C. Penney filed a protest with the Board pursuant to Neb. Rev. Stat. § 77-1502 (Reissue 1996). J.C. Penney claimed that the county assessor's figure of $9,007,973 was not the true market value of the property and requested a valuation of $5,285,910. Pursuant to Neb. Rev. Stat. § 77-1502.1 (Reissue 1996) (Board may direct referees to conduct hearings on any protests filed pursuant to § 77-1502), Richard Keith, a Nebraska licensed real estate appraiser, was assigned to review the valuation of J.C. Penney's property. Wayne Kubert was designated referee coordinator, and a hearing was set for July 2.

At the hearing on July 2, 1996, no one appeared on behalf of J.C. Penney. Despite that fact, Keith's pro forma analysis was introduced. Keith's report recommended that the value of the subject property be reduced to $6,815,860. This value was based upon (1) the property record data provided by the county assessor, (2) market sales data used by the assessor, (3) income data used by the assessor, and (4) the referee's personal inspection of the interior and exterior of the subject property. No information was provided to Keith by J.C. Penney for preparation of the appraisal.

Initially, Kubert concurred with Keith's recommendation and signed the referee report valuing the subject property at $6,815,860. Subsequently, however, Kubert began valuing other properties in the Gateway Shopping Center, and he became concerned about the lack of equalization among these properties. As a result, Kubert changed his mind and decided to override Keith's recommendation. With respect to Keith's report, a hand-

written note was made on the front page which stated, "BOE - Reviewed market rents - & sales - Dillards - also cost of cons. of Penney's est. 9-10 mil Adjust value to $69 or $8.25 rent 125,870 sq. ft. x $69. $8,685,000." Although this figure is the Board's final assessment and there was testimony that this handwriting looked like Kubert's, the notation was never directly proved to be his—nor did he testify and claim it as his.

In the meantime, Keith's original report, containing the recommendation of $6,815,860 and Kubert's signature, was sent to J.C. Penney by mail and received at its Dallas, Texas, offices on July 22, 1996. The report also gave notice to J.C. Penney that the Board was scheduled to take final action on the recommendation on July 23 at 9:30 a.m. Due to the short notice, no representative of J.C. Penney was able to personally appear at the hearing; however, George Rawlings, an appraiser employed by J.C. Penney, did participate by telephone. The hearing was recorded, and a transcript is part of our record.

Only minutes before the hearing formally began did Rawlings learn that Keith's recommendation had been overridden and that the property was now appraised at $8,685,000 rather than $6,815,860. Kubert explained to Rawlings the change in value by stating:

> We're reviewing all the shopping center. The shopping center itself, obviously, has been rebuilt and redone. It has a new value going out very shortly . . . and that value is in the range of $80 a square foot. [We note that the county's original valuation of $9,007,973 resulted in an assessment of $72 per square foot and that Kubert's revised recommended value of $8,685,000 resulted in an assessment of about $69 per square foot.] And in equalizing all the buildings within the shopping center . . .
>
> . . . .
>
> . . . we decided we'd better take a look at the whole picture as opposed to dropping down to something that is probably premature at this point.
>
> . . . .
>
> . . . [W]e've all read the paper up here in which . . . we had heard that you were spending close to $10,000,000 out there or something . . . would you share with us the cost of this facility?

Rawlings responded that he would "be more than happy to supply any information in regards [sic] to cost" and requested additional time to assemble the necessary information. The conversation continued:

> [Kandra Hahn, Lancaster County Clerk]: He doesn't think he can get that to you this morning. When . . .
>
> [Darlene Tussing, Board member]: When's our final date?
>
> HAHN: The 25th.
>
> [Kathy Campbell, Board member]: Thursday is the final . . . we haven't scheduled any meetings for Thursday.
>
> [Kubert]: Just get . . . it up as soon as you can. It's going to have to come out anyway. We're going to have to deal with it. That's the best we can do.

Rawlings then faxed a letter objecting to the short notice. That same day, the Board took final action on the protest and accepted Kubert's recommendation of $8,685,000 as the final valuation of the property.

J.C. Penney then appealed to the Commission, pursuant to Neb. Rev. Stat. § 77-1510 (Reissue 1996). In preparation for the hearing before the Commission, the Board requested commercial appraiser Court Monroe of the county assessor's office, who had prepared the original appraisal of $9,007,973, to prepare yet another appraisal of the subject property. The hearing before the Commission was held on February 5, 1997. J.C. Penney adduced the following as evidence of value: lease data for J.C. Penney stores located in Kansas, Oklahoma, Nebraska, and Iowa; a buyer settlement statement showing that the land the subject property sits on was purchased for $2,267,000; and assessments for J.C. Penney stores located in five other midwestern states. J.C. Penney also introduced evidence of the Board's hearing procedures and the facts that J.C. Penney was allowed only 1 day's notice to prepare for the hearing and was notified 5 minutes prior to this hearing that Keith's recommendation had been overridden. The Board introduced Monroe's appraisal of the property, transcripts of the proceedings before the Board, and a copy of Keith's recommendation. In preparing his appraisal, Monroe employed three traditional approaches to

value—the cost approach, the income approach, and the sales comparison approach.

Monroe's cost approach began with an estimate of land value based upon an analysis of six recent sales of vacant land in Lancaster County which were subsequently used for development of large retail establishments. His estimate of value for the J.C. Penney land was $2,265,660. Monroe then estimated the value of the improvements (replacement cost new) using the segregated cost method as defined by the Marshall Valuation Service. The total replacement cost new of the improvements on the land was $8,578,236. Monroe estimated the total depreciation of the improvements to be $722,686 and subtracted that from the replacement cost new to arrive at a value of $7,855,550 for the improvements. Addition of the land value of $2,265,660 resulted in a final value, under the cost approach, of $10,121,210.

Monroe also used the income approach. Using data from four large retail facilities in Lincoln, Monroe developed estimates of what rents the subject property would likely generate, what expenses it would incur, and an expected net operating income. Relying on published data, Monroe determined that 7.5 percent was an appropriate capitalization rate. Application of this rate to the estimated net operating income resulted in a value, under the income approach, of $8,307,420.

Finally, Monroe used the sales comparison approach. This approach compares the property being appraised with similar properties sold in the recent past. However, because only one department store in the Lincoln area had been sold in recent years, the data available for such an analysis was obviously limited. Monroe used the confirmed sales price of that single property, together with reported costs of its rehabilitation, to arrive at a valuation of $71.86 per square foot. He then applied that figure to the square footage of the subject property for a value, under the sales comparison approach, of $9,045,018.

In an order filed June 26, 1997, the Commission affirmed the decision of the Board appraising the subject property at a value of $8,685,000 for the 1996 tax year. In its analysis, the Commission noted that J.C. Penney's evidence was of no assistance in establishing a proper valuation. In evaluating the

Board's evidence, the Commission rejected Monroe's income approach because of a lack of comparability of the other rental properties, primarily because with respect to size there was more than a 10-percent difference in square footage. In addition, the sales comparison approach was rejected because it relied on only one sale. However, the Commission recognized Monroe's use of the cost approach as valid.

The Commission also found that J.C. Penney had received only 1 day's notice of the fact that the Board was going to take final action on its protest and that it was not until 5 minutes prior to the hearing that J.C. Penney learned that Keith's recommended valuation of $6,815,860 had been changed. On the basis of the above factors, the Commission concluded:

> The record in this case demonstrates that the County's procedures for holding "protest" hearings pursuant to . . . Neb. Rev. Stat. § 77-1501, *et seq.* (Reissue 1996) are unreasonable and arbitrary. However, the record before the Commission *supports* [emphasis supplied] the assessed value of the subject property for tax year 1996. Therefore, the Commission must, and hereby does, conclude as a matter of law that the determination of the County that the assessed value of the subject property should be $8,685,000 for tax year 1996 was neither unreasonable nor arbitrary.

J.C. Penney then appealed to this court pursuant to Neb. Rev. Stat. § 77-5019 (Reissue 1996), and the Board cross-appealed.

## ASSIGNMENTS OF ERROR

J.C. Penney argues that the Commission erred in (1) affirming the Board's valuation because there was sufficient evidence presented that this valuation was either inflated or based upon a questionable application of valuation methods, (2) affirming the Board's valuation by relying solely on one appraisal in a report prepared specifically to defend the Board's decision, (3) failing to compel the production of information and additional evidence determined to be necessary to properly assess the valuation, and (4) failing to accurately assess the value of J.C. Penney's property even though finding that the Board acted in an arbitrary and unreasonable manner. On cross-appeal, the

Board argues that the Commission erred in finding that the procedures employed by the county for holding hearings on protests filed pursuant to § 77-1502 were unreasonable and arbitrary.

## STANDARD OF REVIEW

Our review of a final decision of the Commission is for error on the record of the Commission. § 77-5019(5). When reviewing an order for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Conservatorship of Estate of Marsh*, 5 Neb. App. 899, 566 N.W.2d 783 (1997).

## ANALYSIS

*Commission's Standard of Review.*

We first briefly discuss the Commission's standard of review of an appeal from a decision of a county board of equalization. In its decision on the matter in the instant case, the Commission discussed, but did not actually pronounce, what it thought was its standard of review. The Commission stated:

> The Tax Equalization and Review Commission is not a court. The Commission was created pursuant to state law to provide for an accessible and affordable system of review of valuation decisions. Under such circumstances, applying the standard devised by the Nebraska Supreme Court to the Commission would be presumptuous and ill-advised.
>
> Therefore, the Commission must adopt a standard applicable to cases it hears and decides. This standard must be in keeping with the precept that tax laws are to be strictly construed, and construed in the light most favorable to the taxpayer. [Citations omitted.] In determining that standard, resort must be made to the language of the statute. The Nebraska Supreme Court has often held that statutory construction is a simple task. The Court has held "In construing a statute, it is presumed that the Legislature intended a sensible rather than an absurd result. . . [.] Statutory Language is to be given its plain and ordinary meaning. . . ."

 There is a lack of authority for some of what the Commission said, but, in any event, Neb. Rev. Stat. § 77-1511 (Reissue 1996) explicitly provides that the Commission shall hear appeals from a county board of equalization "as in equity and without a jury and determine anew all questions raised before the county board of equalization which relate to the liability of the property to assessment, or the amount thereof." Section 77-1511 further provides that the Commission shall affirm the action taken by a county board of equalization unless evidence is adduced establishing that the action of the board was unreasonable or arbitrary, or unless evidence is adduced establishing that the property of the taxpayer is assessed too low.

In *Harrison Square v. Sarpy Cty. Bd. of Equal., ante* p. 454, 574 N.W.2d 180 (1998), we recognized § 77-1511 as setting forth the Commission's standard of review. Thus, despite the Commission's apparent uncertainty about its standard of review, we think the law is clear. The Commission is directed to the above statutory language.

*Failure of Commission to Compel Production of Information.*

J.C. Penney argues that the Commission erred by failing to compel the production of information and additional evidence determined by the Commission to be necessary to properly assess the valuation of J.C. Penney's property. The Commission was critical of the evidence offered by J.C. Penney. Under the subheading "Taxpayer's Evidence," the Commission said:

> Exhibit one shows lease data for J. C. Penney stores which are located in Kansas, Oklahoma, Nebraska and Iowa. However, the record does not establish that these stores are anchor stores in a super regional center, the demographics of the towns, market information, etc. This information is essential in order to determine whether these stores are comparable to the subject property. Exhibit four consists of assessments for J. C. Penney stores located in five midwestern states. However, "assessed value" is meaningless without information regarding the real property tax laws of the states of Kansas, Iowa, and Colorado. That information is therefore of no assistance. Furthermore, the information regarding

the assessments in Kearney and Omaha is likewise of little value, since the Taxpayer did not make the indicated levels of value for those cities part of the record, and further did not request the Commission to take notice of that information. Finally, no evidence was presented to establish the quality, condition, or income for those properties. The Commission's observations about the shortcomings of J.C. Penney's proof are on target.

J.C. Penney alleges that the Commission had a mandatory duty stemming from Neb. Rev. Stat. § 77-5007 (Reissue 1996) to order the submission of information and documentation regarding the shortcomings it recited in J.C. Penney's proof.

■ Section 77-5007 provides in pertinent part: "The commission has the power and duty to hear and determine appeals of: (1) Decisions of any county board of equalization equalizing the value of individual tracts, lots, or parcels of real property so that all real property is assessed uniformly and proportionately." From this language, J.C. Penney reasons that the Commission has "an affirmative duty to determine the proper valuation of the property, and if necessary to employ its statutory powers to compel the production of all evidence needed to make that determination." Brief for appellant at 27. As support for that conclusion, J.C. Penney quotes the language of Neb. Rev. Stat. § 77-5014 (Reissue 1996) that the Commission " '*shall* take evidence and otherwise conduct the appeal as provided in sections 77-5015 to 77-5019.' " Brief for appellant at 28. Finally, J.C. Penney notes Neb. Rev. Stat. § 77-5016(3) (Reissue 1996), which requires in part that in appeals to the Commission, "[a]ll evidence including records and documents in the possession of the commission of which it desires to avail itself shall be offered and made a part of the record in the case."

J.C. Penney then catalogs certain powers afforded the Commission under the provisions of 1995 Neb. Laws, L.B. 490, which established the Commission. These powers, labeled "broad" by J.C. Penney, brief for appellant at 17, include (1) the power to issue writs of mandamus to compel compliance with the Commission's orders, see Neb. Rev. Stat. § 77-5008 (Reissue 1996); (2) the power to order reappraisals of property within a county, see Neb. Rev. Stat. § 77-5017 (Reissue 1996);

and (3) the power to take notice of certain statistical information, see § 77-5016(5). Despite the fact that these powers are described in permissive ("may") terms, J.C. Penney reasons that their exercise becomes mandatory when the Commission is performing one of its mandatory duties, i.e., accurately assessing property to achieve uniformity and proportionality. J.C. Penney concludes that the Commission has a mandatory duty to individually assess and equalize the value of the subject property and because such duty is mandatory, it is also mandatory that the Commission exercise its broad powers to require the parties to obtain and make part of the record the information identified above as lacking.

In short, J.C. Penney argues that the Commission should act as a "litigation advisor" and help the parties decide what evidence to introduce before the Commission. In fact, J.C. Penney would have the Commission tell the parties what evidence it wants to hear. This proposition can charitably be described as unsound. Neither the language of the cited statutes nor the legislative history of L.B. 490, which created the Commission, justifies such an expansive (and novel) construction of the statutes regarding the Commission.

While § 77-5007 generally sets forth the powers of the Commission, § 77-1511, in pertinent part, articulates how these powers are exercised:

> The Tax Equalization and Review Commission shall hear appeals and cross appeals taken under section 77-1510 as in equity and without a jury and determine anew all questions raised before the county board of equalization which relate to the liability of the property to assessment, or the amount thereof. The commission shall affirm the action taken by the board unless evidence is adduced establishing that the action of the board was unreasonable or arbitrary or unless evidence is adduced establishing that the property of the appellant is assessed too low.

Statutory language is to be given its plain and ordinary meaning, and we will, if possible, try to avoid a construction which would lead to absurd, unconscionable, or unjust results. *Hilliard v. Robertson*, 253 Neb. 232, 570 N.W.2d 180 (1997).

When considering a series or collection of statutes pertaining to a certain subject matter which are in pari materia, they may be conjunctively considered and construed to determine the intent of the Legislature, so that different provisions of the act are consistent and sensible. *Baker's Supermarkets v. State*, 248 Neb. 984, 540 N.W.2d 574 (1995). A sensible reading of §§ 77-5007 and 77-1511, against the backdrop of the American legal system, which proceeds on the core notion that the adversary process produces truth and justice, leads to the conclusion that it was not the Commission's duty to compel J.C. Penney to produce more probative evidence at the hearing.

Furthermore, it must be remembered that the creation of the Commission removed the district courts from the valuation process and substituted the Commission in this phase. During the floor debate on L.B. 490, Senator Doug Kristensen, the bill's introducer, said:

> [I]n a district court they're only limited to the evidence that is presented. The Tax Equalization and Review Commission is going to have the information from the Department of Revenue. They're going to be able to use that and they're also going to be able to look at the techniques.

Floor Debate, 94th Leg., 1st Sess. 3465 (Mar. 29, 1995). But beyond this, the history reveals that the Commission is to review evidence just as the district court did in appeals from county boards of equalization. The only material difference between an appeal from a board of equalization before the passage of L.B. 490 and after is that § 77-5016(5) allows the Commission to take judicial notice of "general, technical, or scientific facts within its specialized knowledge or statistical information regarding general levels of assessment." Although the process is a trial "anew," that hardly means that the Commission is also to order up the evidence. The district courts did not have a mandatory duty to compel litigants to produce more, different, or better evidence when hearing appeals from county boards of equalization, and neither does the Commission.

Finally, with regard to this assignment of error, we note that while the Commission cited specific foundational deficiencies in J.C. Penney's evidence as the basis for its decision not to give

weight to that evidence, it did not say that filling the foundational gaps was necessary to a proper resolution of the issues before it. In other words, the Commission never indicated that the evidence presented to it made the resolution of the case impossible, but, as the Board observes, "it simply made it impossible to resolve the case in taxpayer's favor." Brief for appellee at 25. The assignment of error is without merit.

### Validity of Board's Valuation.

We take J.C. Penney's remaining three assignments of error as one. They are, restated, that the Commission erred in affirming the Board's valuation because (1) there was evidence that the valuation of $8,685,000 was inflated and inaccurately determined; (2) the Commission relied solely on Monroe's appraisal, an appraisal prepared specifically for the hearing before the Commission; and (3) having found that the Board acted in an arbitrary and unreasonable manner, the Commission had a duty to reverse its decision under the provisions of § 77-1511.

The Commission shall affirm the action taken by a county board of equalization unless evidence is adduced establishing that the action taken by the board was unreasonable or arbitrary, or unless evidence is adduced establishing that the property of the appellant is assessed too low. § 77-1511. This language is the same as in the statute preceding it, when property tax matters went from the county board of equalization to the district court instead of to the Commission. Thus, it logically follows that the principles which were articulated from this statutory language when the district court heard these matters maintain viability now that the Commission has taken over the district court's role. Before the Commission existed, the Nebraska Supreme Court held with regard to this statutory language:

> In an appeal to the county board of equalization or to the District Court, and from the District Court to this court, the burden of persuasion imposed on the complaining taxpayer is not met by showing a mere difference of opinion unless it is established by clear and convincing evidence that the valuation placed upon his property when compared with valuations placed on other similar property is grossly excessive and is the result of a systematic exer-

cise of intentional will or failure of plain duty, and not mere errors of judgment.

*Bumgarner v. County of Valley*, 208 Neb. 361, 366, 303 N.W.2d 307, 310 (1981). We hold that this standard for the taxpayer's burden of persuasion applies with equal force when appeals on real property valuations are heard before the Commission. We also believe it appropriate to remind taxpayers that the *Bumgarner* court said that " 'absolute or perfect equality and uniformity in [property] taxation cannot be attained. . . .' " *Id.* The *Bumgarner* court referred to the principle of " 'practical uniformity,' " *id.*, a concept which also bears remembering.

■ In determining whether to affirm the decision of a county board of equalization, the Supreme Court has stated:

There is a presumption that a board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. That presumption remains until there is competent evidence to the contrary presented, and the presumption disappears when there is competent evidence adduced on appeal to the contrary. From that point forward, the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon all the evidence presented. The burden of showing such valuation to be unreasonable rests upon the taxpayer on appeal from the action of the board.

*Ideal Basic Indus. v. Nuckolls Cty. Bd. of Equal.*, 231 Neb. 653, 654-55, 437 N.W.2d 501, 502 (1989). See, also, *Helvey v. Dawson County Bd. of Equal.*, 242 Neb. 379, 495 N.W.2d 261 (1993). In proceedings before the Commission, if the taxpayer overcomes the presumption, then the issue before the Commission is essentially a question of fact, with the taxpayer having the burden of persuasion.

The Commission held that "[t]he record in this case demonstrates that the County's procedures for holding 'protest' hearings pursuant to . . . Neb. Rev. Stat. § 77-1501, *et seq.* (Reissue 1996) are unreasonable and arbitrary." We address this issue more closely in our examination of the Board's cross-appeal, but note, for the purposes of this assignment of error, that the

Commission did not find that the Board's final valuation of the subject property at $8,685,000 was arbitrary or unreasonable.

In our review of the Board's valuation of J.C. Penney's property, we must focus first on the presumption of regularity. Our review of the record reveals that Kubert's decision to override Keith's recommendation on valuation was deficient because it was based on insufficient evidence and improper considerations, such as other Gateway property not yet valued and newspaper articles. Therefore, the Board's approval of Kubert's new valuation of $8,685,000 was unreasonable. The record shows that Keith's independent recommendation set a value of $6,815,860. This value was based upon (1) the property record data provided by the county assessor, (2) market sales data used by the assessor, (3) income data used by the assessor, and (4) the referee's personal inspection of the interior and exterior of the subject property. Kubert originally approved this recommendation, going so far as to transmit the $6,815,860 figure to J.C. Penney at its headquarters in Dallas as the valuation for its Lincoln property. However, Kubert changed his mind with respect to this figure, a decision J.C. Penney learned about only minutes before the telephonic Board hearing on July 23, 1996.

Kubert revalued the subject property at $8,685,000 based on (1) an attempt to place all properties located in the Gateway Shopping Center in the projected $80-per-square-foot range and (2) a newspaper article indicating that the cost of constructing the subject property was approximately $10,000,000. Picking a target for a property's value by aiming for a figure to be used for "all of the shopping center" is suspect, and there is no evidence that this is a regular and proper valuation tool. While cost is relevant to the valuation process, relying on a newspaper article for the cost of improvement rather than securing the actual cost is flawed. The procedure surrounding this matter became arbitrary when J.C. Penney was asked for cost data and agreed to provide it, but the Board set its final valuation that same day without waiting for the information it had requested. Apparently, the Board decided not to wait for the information because "we haven't scheduled any meetings for Thursday."

Having determined that the board acted in an arbitrary manner in valuing the subject property at $8,685,000, the presump-

tion that the Board faithfully performed its duties in making an accurate assessment based upon competent evidence disappears, and "the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon all the evidence presented" to the Commission. *Ideal Basic Indus. v. Nuckolls Cty. Bd. of Equal.*, 231 Neb. 653, 655, 437 N.W.2d 501, 502 (1989). Even if the presumption in favor of the value set by the board of equalization is overcome, the burden rests on the taxpayer to show that the board's value was unreasonable. See *id.* Here, the issue before the Commission was one of fact. We find that the Commission was correct in affirming the Board's decision. It is undisputed that the county assessor's computer-assisted appraisal system generated value estimates of $9,007,973 and $10,315,500 for the subject property by the cost approach and the income approach, respectively.

The above cost-approach value was also verified by a separate "off-system evaluation" performed by Monroe. J.C. Penney's failure to introduce any probative evidence as to valuation (as said, we agree with the Commission's characterization of J.C. Penney's evidence) did not, as mentioned before, make it impossible to accurately assess the subject property. J.C. Penney simply failed to introduce sufficient evidence at the hearing to carry its burden of persuasion that the Board's appraisal was wrong. J.C. Penney did not introduce any evidence of its own appraisal of the property. Monroe's cost-approach appraisal relied upon by the Commission was competent evidence upon which to uphold the $8,685,000 valuation adopted by the Commission.

*Cross-Appeal.*

■ In its cross-appeal, the Board argues that the Commission erred in finding that the procedures employed by the county for protest hearings filed pursuant to § 77-1502 were unreasonable and arbitrary. The Board alleges that it had no notice that its procedures for conducting protest hearings would be an issue and that because Neb. Rev. Stat. § 77-5015 (Reissue 1996) specifically requires the Commission to notify the parties of the issues involved and afford them the opportunity to present evidence and argument on those issues, the Commission's failure

to do so in this case renders its findings on the issue of the county's procedures contrary to law.

The Commission found that "[t]he record in this case demonstrates that the County's procedures for holding 'protest' hearings pursuant to . . . Neb. Rev. Stat. § 77-1501, *et seq.* (Reissue 1996) are unreasonable and arbitrary." The Board apparently sees this finding as a blanket condemnation of the Board's protest hearing procedures rather than merely condemnation of the actions of the Board in this particular case. We do not see that the Commission found, nor do we hold in this opinion, that the Board's regular or routine protest and hearing procedures are arbitrary and unreasonable. Rather, certain actions in this particular case were arbitrary and unreasonable. For example, J.C. Penney received 1 day's notice as to the Board's final hearing. In addition, J.C. Penney discovered approximately 5 minutes prior to this hearing that its property had been substantially revalued to J.C. Penney's detriment. Finally, J.C. Penney was given only 3 to 4 hours to collect and fax information on improvement costs—costs which were important to the Board's decision and which were asked for.

Although Kubert's valuation finds support in other evidence before the Commission, specifically the Monroe appraisal, Kubert's reasoning by which he overrode Keith's appraisal was flawed and should not have been adopted by the Board. But since the Board's valuation is supported by other evidence and J.C. Penney introduced no competent evidence before the Commission to dispute the Monroe appraisal in any meaningful way, we cannot say that the Commission erred in its valuation.

As said, there were flaws in the way the Board handled this particular case, but none which change the result before the Commission. To the extent that the cross-appeal seeks a blanket endorsement of the Board's protest procedures, it lacks merit.

## CONCLUSION

The Commission's order affirming the Board's decision regarding valuation of the subject property is affirmed, and the Board's cross-appeal is denied.

AFFIRMED.