LANCASTER COUNTY BOARD OF EQUALIZATION, APPELLANT,
v. CONDEV WEST, INC., APPELLEE.

581 N.W. 2d 452

Filed July 7, 1998. No. A-97-838.

320

Gary E. Lacey, Lancaster County Attorney, and Michael E. Thew for appellant.

Jerry M. Slusky, of Gross & Welch, P.C., for appellee.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

SIEVERS, Judge.

## INTRODUCTION

The Lancaster County Board of Equalization (Board) appeals the order of the Nebraska Tax Equalization and Review Commission (Commission) which reversed the Board's $10.2 million valuation for property tax purposes of the Dillard's department store in Lincoln's Gateway Shopping Center.

## BACKGROUND

Condev West, Inc. (Condev), owns commercial real property located in the city of Lincoln, Lancaster County, Nebraska. This property, Dillard's, was purchased by Condev in May 1994 for

$6 million. The property was subsequently renovated at a cost of $5.2 million. For the 1996 tax year, the county assessor proposed to value the subject property at $11,335,800. This figure was originally calculated by the county's computerized mass appraisal system using an income approach. The $11,335,800 figure was then reviewed by Court Monroe, a commercial appraiser on the county assessor's staff. He compared the value to other similar properties in Lincoln and concluded that the computer-generated value was within a "good range" and accepted it.

On June 17, 1996, Condev filed a protest pursuant to Neb. Rev. Stat. § 77-1502 (Reissue 1996) with the Board. Condev claimed that the proposed valuation of the subject property "is in excess of its market value based on an income approach or of comparable department stores in the area" and requested a valuation of $7,008,000. Pursuant to Neb. Rev. Stat. § 77-1502.01 (Reissue 1996) (county board of equalization may direct referees to conduct hearings on any protests filed pursuant to § 77-1502), Cay Lacey, a Nebraska licensed appraiser, was assigned to review the valuation of Condev's property. Wayne Kubert was designated as referee coordinator, and a hearing was set for June 28.

At the hearing on June 28, 1996, no one appeared on behalf of Condev. Despite that fact, Lacey's pro forma analysis was introduced. Lacey's report recommended that the value of the subject property be reduced to $7,475,000. This value was based upon (1) data provided by the county assessor, (2) market sales data used by the assessor, (3) income data used by the assessor, and (4) the referee's personal inspection of the exterior of the subject property. No information was provided to Lacey by Condev for preparation of the independent appraisal.

Initially, Kubert concurred with this recommendation and signed the referee's report, valuing the subject property at $7,475,000. Subsequently, however, Kubert began valuing other properties in the Gateway Shopping Center, and he became concerned about the lack of equalization among these properties. As a result, Kubert changed his mind and decided to override Lacey's recommendation. With respect to Lacey's report, a handwritten note was made on the front page, which stated,

"BOE — Based on market rents of $8.50 — change market value to $65 or 156,806 x $65 = 10,192,390 called 10,200,000." In addition, the $7,475,000 figure was crossed out and replaced by "$10,200,000." In our record, Kubert claims these handwritten notes as his.

In the meantime, Lacey's original report, containing the recommendation of $7,475,000 and Kubert's signature, was sent to Condev by mail on July 16, 1996, and received at its Fort Worth, Texas, offices. This communication also gave notice to Condev that the Board was scheduled to take final action on the recommendation on July 22, 1996, at 10 a.m. Due to the short notice, no representative of Condev was able to appear at this hearing. However, the following day, July 23, Condev was represented by counsel Michelle Mapes. The hearing was recorded, and a transcript is part of our record.

After Mapes presented documentation supporting Condev's requested valuation of $7 million, Kubert explained the sudden change in valuation:

> W. KUBERT: . . . [T]he reasoning for it is to equalize with the rest of the shopping center. That's all in the process right now. We think we have some additional market data that would substantiate a higher value than the original $7,000,000 but, I think it needs to be all settled out with the shopping center as that goes forward. That's the primary reason for the change at this point.
>
> . . . .
>
> W. KUBERT: I think that the other thing that we looked at somewhat is potentially the cost of the new Penney's store. I don't know that that is fully known at this point. I think that's part of this whole issue. There's a lot of things we don't know yet. . . .

During Kubert's presentation, board member Linda Steinman asked: "Wayne, could you tell us what your valuation was . . . how much you would want to valuate this property at? Ten million what?" Kubert responded: "$10,200,000. That's $65.00 a square foot." Mapes explained to the Board that the subject property was originally constructed in 1970 and that the renovations made to the subject property were "essentially to make

it competitive with the market as opposed to adding value with respect to our property." Mapes continued:

> We're of the opinion, and have documentation to support it, that the value in malls really comes from your smaller retail shops and that the anchors are not where the value resides and that the square foot value is substantially less for those stores.
>
> . . . .
>
> . . . We've not really seen any appreciation in department stores sales nationwide in terms of square footage. The comparable sales that we have attached here are the most up-to-date. They are '93 and '94 sales and they are running about in the $40.00 per square foot range.

Kubert justified the higher valuation by stating that major department stores are building their own buildings and that "they're spending $10,000,000 to build a 125,000 square feet." That same day, the Board took final action on the protest and accepted Kubert's recommendation of $10.2 million as the final valuation of the property.

Condev then appealed to the Commission pursuant to Neb. Rev. Stat. § 77-1510 (Reissue 1996). At the hearing before the Commission, Condev presented the expert testimony of a commercial real estate appraiser, Daniel Markham. In preparing his appraisal, Markham employed all three traditional approaches to value: the cost approach, the income approach, and the market data approach.

Markham's cost approach began with an estimate of the "replacement cost new" of the improvements to the building and the parking garage using the Marshall & Swift cost estimating system. The total replacement cost new of the property was $10,293,000, of which $8,480,000 represented the replacement cost new of the building and the balance represented the adjacent parking structure. The cost figures utilized by Markham were based on his opinion that the quality of the improvements was "average" and that their condition was "excellent." To estimate physical depreciation of the improvements, Markham divided the components into short-lived (having a useful life that is less than the entire building) and long-

lived items. According to Markham's appraisal, the physical depreciation was $1,375,000 and $2,435,000 for short-lived and long-lived items respectively. Markham also calculated a figure, $1,040,000, which he testified represented the "external obsolescence" of the building. According to Markham,

> External obsolescence results from several different sources. It may be due to something outside of the property that has an adverse effect on value, or it may be simply due to the economic conditions of the — of what the property — of the market that the property is in, and that is the case here.

The total depreciated value of the building was estimated to be $3,630,000 (replacement cost new of the building minus depreciated value of improvements and external obsolescence). After taking into account the depreciated value of the parking ramp, $1,050,000, Markham estimated the total depreciation of the improvements to be $4,680,000. Addition of the land value of $2,650,000 resulted in a final value estimate, under the cost approach, of $7,350,000.

Markham also used the income approach. Using information from 30 leases of anchor department stores in regional or super regional shopping centers, Markham developed estimates of what rents the subject property would likely generate, what expenses it would incur, and an expected net operating income. Then, relying on the analysis of eight sales of anchor department stores being leased, he determined a capitalization rate of 9 percent. Application of this rate to the estimated net operating income resulted in a range of value under the income approach from $7,075,000 to $7,450,000.

Finally, Markham used the market data approach. This approach compares the property being appraised with similar properties sold in the recent past. Markham collected data regarding the sale of 32 anchor department stores. He analyzed that information and identified five sales which he felt were most comparable to the subject property, including the sale of Dillard's itself in 1994. Markham adjusted the sale prices of the comparables to reflect differences between them and the subject property in terms of age, size, land-to-building ratio, condition, and location. Using this information, Markham concluded that

the subject property would likely sell at a price from $43 to $46 per square foot. He then applied that figure to the square footage of the subject property (156,806) for a value, under the market data approach, of $6,750,000 to $7.2 million.

In determining a final opinion of value of $7.1 million from the three approaches, Markham "didn't consider the cost approach meaningful to value because of the substantial mode of external obsolescence present." Markham considered the income approach as the most accurate estimate of value and gave the market data approach "secondary consideration."

The Board's evidence before the Commission consisted of the testimony of Kubert and the appraisal and testimony of Monroe. Like Markham's analysis, Monroe's analysis employed all three traditional approaches to value. On the basis of his analysis, Monroe concluded that the value of the subject property was in a range from $10,377,000 to $12,865,000.

Monroe's cost approach was similar to Markham's, segregating the various components of improvements on the subject property and then computing their replacement cost new using the Marshall & Swift cost estimating system. However, in Monroe's judgment, the quality of the improvements was "above-average" rather than "average," and, accordingly, the cost factors utilized by Monroe were higher than those used by Markham. Monroe also included two factors in his cost approach that Markham did not, namely: (1) additional costs associated with ensuring the proper grade on the very large slabs of concrete contained in the subject property and (2) the cost of keeping moisture out of the ground floor. Monroe also valued the " 'H.V.A.C.' " (heating, ventilation, and air conditioning) system, one of the building's short-lived items, substantially higher than Markham. Monroe's final estimate of value by the cost approach was $12,864,979. Monroe made no deduction for external obsolescence. His land value was also $172,508 higher than Markham's estimate.

Monroe also used the income approach. He analyzed the rents that would have been due under leases that existed for two Gateway Shopping Center anchor stores before they were sold plus rental information from five other retail properties in the Lincoln market to arrive at a rental rate of $6.25 per square foot.

After calculating net operating income of $882,034, Monroe used a capitalization rate of 8.5 percent to estimate a final value of $10,376,868.

Finally, Monroe used the market data (sales comparison) approach. He used the confirmed sale price of the subject property, together with renovation costs, to arrive at a valuation of $71.50 per square foot, in contrast to Markham's figure of $43 to $46 per square foot. Monroe's comparables included discount stores not located in a super regional mall, but Markham used only stores located in super regional malls with four or more anchor stores. Markham's comparables, unlike Monroe's, included stores located outside the city of Lincoln as well as outside the State of Nebraska. We note briefly that Markham's market data analysis did not take into consideration the renovation costs of any of the comparables. Monroe then applied $71.50 to the square footage of the subject property for a value of $11,211,629. Thus, Monroe's analysis resulted in a range of values from $10,377,000 to $12,865,000. Unlike Markham, Monroe felt that the best indicator of value was the cost approach and concluded that the value set by the Board was conservative, being below the range of predicted values.

In an order dated July 16, 1997, the Commission reversed the action of the Board, finding "that the decision of the Lancaster County Board of Equalization denying Taxpayer's request for a reduction in the value of the subject property was unreasonable and arbitrary." The Commission set the value of the subject property at $7,502,508 and held "[t]hat County's Calculation of Land Value of $2,822,508 was supported by the evidence adduced and is equitable with the land values placed on other mall anchors. . . . That Taxpayer's appraisal indicated Cost Approach value of $4,680,000 for the building and the parking structure was supported by the evidence." The Commission rejected the income approach valuations of both appraisers because the valuations did not adequately address the "critical factor in analyzing the Income Approach [which] is the 'risk' factor." The Commission found the Board's market data approach without credibility because the sales used were not sufficiently comparable to the subject property. Likewise, it

afforded Condev's market data valuation little credibility because its comparables were from markets outside Nebraska.

The Commission also found that Condev had received little notice of the fact that the Board would take final action on its protest and that it was not until the actual hearing on July 22, 1996, that Condev learned that Lacey's recommendation of $7,475,000 had been changed to $10.2 million. No further comment was made by the Commission with respect to notice. The Board appeals to this court pursuant to Neb. Rev. Stat. § 77-5019 (Reissue 1996).

## ASSIGNMENTS OF ERROR

Restated, the Board argues that the Commission failed to (1) properly apply the standard of review mandated by Neb. Rev. Stat. § 77-1511 (Reissue 1996), (2) afford the action of the Board a presumption of correctness, and (3) apply the proper standard of proof. The Board also argues that the Commission erred (1) in failing to find the Board's action was supported by sufficient evidence and (2) in finding that the value set by the Board was unreasonable and arbitrary.

## STANDARD OF REVIEW

Our review of a final decision of the Commission is for error on the record of the Commission. See § 77-5019(5). When reviewing an order for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *J.C. Penney Co. v. Lancaster Cty. Bd. of Equal.*, 6 Neb. App. 838, 578 N.W.2d 465 (1998) (appellate review of Commission's decision valuing an anchor department store at Gateway Shopping Center).

## ANALYSIS

*Standard of Review.*

We first briefly discuss the Commission's standard of review of an appeal from a decision of a county board of equalization. In its decision on the matter in the instant case, the Commission discussed, but did not actually pronounce, what it thought was its standard of review. The Commission stated:

The Tax Equalization and Review Commission is not a court. The Commission was created pursuant to state law to provide for an accessible and affordable system of review of valuation decisions. Under such circumstances, applying the standard devised by the Nebraska Supreme Court to the Commission would be presumptuous and ill-advised.

Therefore, the Commission must adopt a standard applicable to cases it hears and decides. This standard must be in keeping with the precept that tax laws are to be strictly construed, and construed in the light most favorable to the taxpayer. [Citations omitted.] In determining that standard, resort must be made to the language of the statute. The Nebraska Supreme Court has often held that statutory construction is a simple task. The Court has held "In construing a statute, it is presumed that the Legislature intended a sensible rather than an absurd result. . . [.] Statutory language is to be given its plain and ordinary meaning. . . [.]" [Citation omitted.]

Finally, the Nebraska Supreme Court has held that an administrative decision is "arbitrary" when it is made in disregard of the facts or circumstances and without some basis which would lead a reasonable person to the same conclusion.

■■■ We recently addressed the Commission's use of this identical language in *J.C. Penney Co., supra.* The aforecited language has apparently become "boilerplate" for the Commission when deciding matters before it. As we held in *J.C. Penney Co.*, § 77-1511 explicitly provides that the Commission shall hear appeals from a county board of equalization "as in equity and without a jury and determine anew all questions raised before the county board of equalization which relate to the liability of the property to assessment, or the amount thereof." Section 77-1511 further provides that the Commission shall affirm the action taken by the board unless evidence is adduced establishing that the action of the board was unreasonable or arbitrary, or unless evidence is adduced establishing that the property of the taxpayer is assessed too low. In *Harrison Square v. Sarpy Cty. Bd. of Equal.*, 6 Neb. App. 454, 574 N.W.2d 180 (1998), we recognized § 77-1511 as setting forth the Commission's standard of

review. The Commission is directed to our holdings in *Harrison Square* and *J.C. Penney Co.*

*Validity of Board's Valuation.*

The Board essentially argues that the decision of the Commission was not supported by evidence in the record. However, before this court can determine the validity of the Commission's actions, it must first determine the validity of the Board's decision, because § 77-1511 mandates that the Commission "shall affirm the action taken by the board unless evidence is adduced establishing that the action of the board was unreasonable or arbitrary or unless evidence is adduced establishing that the property of the appellant is assessed too low." Thus, the question becomes, Did Condev adduce evidence before the Commission establishing that the Board's action of valuing the subject property at $10.2 million was unreasonable or arbitrary?

In *J.C. Penney Co. v. Lancaster Cty. Bd. of Equal.*, 6 Neb. App. 838, 578 N.W.2d 465 (1998), we noted that the principles applicable to district court reviews in such matters "maintain viability now that the Commission has taken over the district court's role." *Id.* at 850, 578 N.W.2d at 473. Before the Commission existed, the Nebraska Supreme Court held that in determining whether to affirm the decision of a county board of equalization:

> There is a presumption that a board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. That presumption remains until there is competent evidence to the contrary presented, and the presumption disappears when there is competent evidence adduced on appeal to the contrary. From that point forward, the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon all the evidence presented. The burden of showing such valuation to be unreasonable rests upon the taxpayer on appeal from the action of the board.

*Ideal Basic Indus. v. Nuckolls Cty. Bd. of Equal.*, 231 Neb. 653, 654-55, 437 N.W.2d 501, 502 (1989). In rebutting the aforementioned presumption,

the burden of persuasion imposed on the complaining taxpayer is not met by showing a mere difference of opinion unless it is established by clear and convincing evidence that the valuation placed upon his property when compared with valuations placed on other similar property is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain duty, and not mere errors of judgment.

*Bumgarner v. County of Valley*, 208 Neb. 361, 366, 303 N.W.2d 307, 310 (1981). The *Bumgarner* court continued: " 'It must be demonstrated by evidence that the assessment is grossly excessive and is a result of arbitrary or unlawful action, and not a mere error of judgment.' " *Id.*

In its brief on appeal and before the Commission, the Board argued that its decision to value the subject property at $10.2 million was based on four things: (1) the initial county appraiser's office computer estimate of $11,335,800, (2) Lacey's recommendation of $7,475,000, (3) Kubert's recommendation that the value be set at $10.2 million, and (4) Condev's evidence establishing a value of $7 million. However, based on the fact that the Board's final valuation was exactly that recommended by Kubert, we conclude that the Board really considered only one thing in making its decision—the testimony and recommendation of Kubert. Thus, we examine what Kubert had to say in his testimony.

Before the Commission, Kubert testified that based on the costs of other department stores in Nebraska and his knowledge of what J.C. Penney paid for its store in the Gateway Shopping Center, the subject property's true market value was $10.2 million. When cross-examined about the comparables he used to estimate the value of the subject property, Kubert testified:

A . . . The market is apparently changing, that's what I'm saying. Dillard's buys one, spends . . . $65.00 a square foot in the building and then we're going to appraise it at $40 something, you know? I don't know. . . . I think the market is changing . . . . So I — that's where I think [Markham's] analysis . . . begins to really fall apart is the fact that we're lookin' at a whole series and taking means

and averages of all of that when there's a lot of factors of market that go into it.

Q Well, give us some evidence, then.

A Well, I'm talking about the Penney store is pure evidence. That's first class.

. . . .

A The Dillard's sale and rebuild is first class evidence.

. . . .

A That's why I changed my mind. Those two primarily, let alone the few other things I do.

Q But do you have any backup for that other, than . . . .

Kubert's testimony continued:

Q Do we have something in front of us that documents your opinion?

A No, I didn't —

. . . .

A I'm not offering any opinion here. I'm here to tell you what . . . .

Q Okay. But I mean your opinion of value to the $10.2, was it something besides what's written at the bottom of this [referee's recommendation]? Nothing else?

A I was not asked to do an appraisal or — so I used the techniques of mass appraisal at that point.

Condev has the right to have its property assessed at actual value. See *AT&T Information Sys. v. State Bd. of Equal.*, 237 Neb. 591, 467 N.W.2d 55 (1991). In its order, the Commission dismissed Kubert's method of valuation by stating that " 'cost,' 'price' and 'value' are not always synonymous." Neb. Rev. Stat. § 77-112 (Reissue 1996) provides in pertinent part:

Actual value of real property for purposes of taxation shall mean the market value of real property in the ordinary course of trade. Actual value may be determined using professionally accepted mass appraisal techniques, including, but not limited to (a) comparison with sales of real property of known or recognized value, taking into account location, zoning, and current functional use; (b) earning capacity of the real property; and (c) reproduction cost less depreciation.

■ In *Potts v. Board of Equalization*, 213 Neb. 37, 46-47, 328 N.W.2d 175, 180 (1982), the Nebraska Supreme Court held:

> "It is true that the purchase price of property may be taken into consideration in determining the actual value thereof for assessment purposes, together with all other relevant elements pertaining to such issue; however, standing alone, it is not conclusive of the actual value of property for assessment purposes . . . ."

The *Potts* court further stated that " ' "other matters relevant to the actual value thereof must be considered in connection with the sale price to determine actual value" ' " but that " ' "[s]ale price" is not synonymous with actual value or fair market value.' " *Id.* at 47, 328 N.W.2d at 180. See, also, *US Ecology v. Boyd Cty. Bd. of Equal.*, 6 Neb. App. 956, 578 N.W.2d 877 (1998) (holding that purchase price is not reflective of actual value).

The record shows that Lacey's independent recommendation set a value of $7,475,000. This value was based upon (1) the property record provided by the county assessor, (2) market sales data used by the assessor, (3) income data used by the assessor, and (4) the referee's personal inspection of the exterior of the subject property. Kubert originally approved this recommendation, going so far as to mail the figure to Condev at its headquarters in Fort Worth. However, Kubert changed his mind with respect to this figure and revalued the subject property at $10.2 million based on (1) an attempt to equalize all properties located in the Gateway Shopping Center, (2) the "Dillard's sale and rebuild," and (3) the alleged costs of constructing the new J.C. Penney building at the Gateway Shopping Center. He testified that he was not asked to perform an appraisal and that he was not "offering any opinion here."

Although the Board argues otherwise, a review of this record shows that it relied on Kubert exclusively in valuing the subject property at $10.2 million. While we recognize that cost is relevant to the valuation process, we remember the holding of *Potts, supra*, that "standing alone, it is not conclusive of the actual value of property for assessment purposes." *Id.* See, also, *J.C. Penney Co. v. Lancaster Cty. Bd. of Equal.*, 6 Neb. App. 838, 578 N.W.2d 465 (1998) (holding that Lancaster County Board

of Equalization was not acting on sufficient evidence when it valued recently constructed J.C. Penney building based on (1) attempt to place all properties in Gateway Shopping Center in projected $80-per-square-foot range and (2) newspaper article indicating cost of constructing subject property). We conclude that Condev adduced competent evidence before the Commission to rebut the presumption that the Board had acted upon competent evidence when it valued the Dillard's store at $10.2 million (which was really nothing but Kubert's figure). Therefore, the Commission was correct in concluding that the decision of the Board "denying Taxpayer's request for a reduction in the value of the subject property was unreasonable and arbitrary."

*Commission's Decision.*

 Because we have determined that the Board acted in an arbitrary manner in valuing the subject property at $10.2 million, the presumption that the Board faithfully performed its duties in making an accurate assessment upon competent evidence disappears. Thus, "the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon all the evidence presented" to the Commission. *Ideal Basic Indus. v. Nuckolls Cty. Bd. of Equal.*, 231 Neb. 653, 655, 437 N.W.2d 501, 502 (1989). Even though the presumption in favor of a property value set by a county board of equalization is overcome, the burden remains on the taxpayer to show that the board's value was unreasonable. *Id.* The reasonableness of the board's valuation becomes a question of fact to be determined from all the evidence tending to establish the actual value of the property. See *Richards v. Board of Equalization*, 178 Neb. 537, 134 N.W.2d 56 (1965). In making its determination, the Commission may consider or dismiss any evidence presented at the hearing. See Neb. Rev. Stat. § 77-5016 (Reissue 1996).

Our review of a final decision of the Commission is for error on the record of the Commission. § 77-5019(5). When reviewing an order for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *J.C. Penney Co., supra.* We find

that the Commission's decision to value the Dillard's store at $7,502,508 was based on competent evidence from Markham's cost approach appraisal and Monroe's computation of the value of land. The Commission's valuation was not arbitrary, capricious, or unreasonable, and it is affirmed.

AFFIRMED.