DeBRUCE GRAIN, INC., APPELLANT, V.
OTOE COUNTY BOARD OF EQUALIZATION, APPELLEE.
584 N.W. 2d 837

Filed September 22, 1998.   No. A-98-001.

Ronald L. Comes, of McGrath, North, Mullin & Kratz, P.C., for appellant.

Max J. Kelch, Otoe County Attorney, for appellee.

HANNON, IRWIN, and INBODY, Judges.

HANNON, Judge.

DeBruce Grain, Inc., appeals the order of the Nebraska Tax Equalization and Review Commission (Commission) which upheld the valuation by the Otoe County Board of Equalization (Board) of $1,113,895 for property tax purposes. We conclude that DeBruce Grain did not introduce sufficient relevant evidence to rebut the presumption the law accords the actions of the Board, and, therefore, we affirm the action of the Commission.

## FACTUAL BACKGROUND

The property at issue here, the DeBruce Grain facility, is a grain elevator facility located along the Missouri River in Nebraska City, Otoe County, Nebraska. The facility consists of a concrete grain elevator, a metal drive-through, an office and scale, and a shower room, all of which were built in 1957. The facility also includes a service garage, a warehouse, a tank, and a barge loading facility. The facility receives and moves grain by both rail and barge. The elevator can load 25 railroad-car units simultaneously. The land has been assessed at $25,070 since 1985, and its valuation is not now in dispute. The elevator has a stipulated capacity of 970,000 bushels. In 1997, the Otoe County assessor's office raised the assessed value of the improvements by 5 percent from $1,036,975, its 1996 assessed

value, to $1,088,825. At that assessed value, the price per bushel of capacity is $1.12.

DeBruce Grain protested the proposed 1997 valuation of its grain elevator facility. There is no verbatim transcript of the hearing before the Board in the record on appeal, and this appeal proceeds on this basis. However, as reflected in the "Property Valuation Protest," filed June 30, 1997, DeBruce Grain requested a valuation of $25,070 for the land and $275,000 for the improvements, for a total value of $300,070. The handwritten stated reason was as follows: "Local elevators appraised at considerably lower value per bushel. Purchased Percival elevator for 18¢ per bushel." As also reflected on the protest, the county assessor recommended "[n]o change." The Board approved the assessor's recommendation of $1,113,895 ($1,088,825 for improvements and $25,070 for land) and denied DeBruce Grain's protest. DeBruce Grain then appealed to the Commission.

At the hearing before the Commission, Paul DeBruce represented his company. Only DeBruce and Robert Dickey, the Otoe County assessor, testified. Their testimony is summarized below. The documentary evidence consists of six exhibits. Exhibit 1 is a document entitled "Appeal to Tax Equalization and Review Commission." It contains the legal description of the property, and under a section headed "Reason for Appeal: Be Specific and attach exhibits" is a list of seven exhibits. That list and the attached exhibits refer to the sales and appraisals referred to in DeBruce's and Dickey's testimony. Exhibit 2 consists of "Points to Consider" and therefore amounts to argument. Exhibits 3 and 4 are the assessor's property record cards for the Farmers Co-ops located in Burr and Palmyra, respectively. Exhibit 5 is a "Cost Approach" worksheet on the subject property, and exhibit 6 is a similar worksheet on an additional building on the subject property.

DeBruce testified that he has worked around elevators all of his life and that in 1978 he started DeBruce Grain. He testified that the company has facilities in 12 locations in 4 or 5 states and that he has been involved in the acquisition of such facilities in the Midwest for the past 20 to 25 years. He specifically testified that he has "looked at probably 200 different facilities

in putting together the group of facilities that DeBruce Grain now has."

DeBruce testified that the overall market for grain elevators "continues to be marginal at best." DeBruce testified that a number of grain elevators have traded in the area of 6 to 22 cents per bushel. DeBruce offered exhibit 1, which included a document entitled "Comparable Sale Summary." The summary listed six different elevators (three in Nebraska, two in Kansas, and one in Iowa), their capacities, and their price per bushel. The capacities ranged from 83,764 bushels to 24 million bushels. The price per bushel ranged from 40 cents per bushel for the smallest facility to 5.8 cents per bushel for the largest facility. According to DeBruce, smaller facilities will trade at a higher cost per bushel due to the "inherent handling equipment."

Exhibit 1 also included a document entitled "Local Elevator Tax Appraisals." This document listed four other Nebraska City elevators with capacities ranging from 770,000 bushels to 1,080,000 bushels and appraised values ranging from $24,505 to $451,685. The appraised values per bushel ranged from 2.9 cents to 41.8 cents. DeBruce admitted that the capacity per bushel numbers were inflated because the appraised values included the value of the land and not just the value of the improvements.

At the hearing, DeBruce testified concerning some of the facilities mentioned in the above documents. DeBruce testified that "the best representation" of a comparable facility was either the Monroe or the Percival facility. These facilities, which had bushel capacities of 7,930,000 and 654,000, respectively, both traded at approximately 18 cents per bushel. However, DeBruce admitted that he bought the Percival facility at an auction and that it is an entirely steel storage facility. According to DeBruce, the cost of constructing a concrete building is significantly higher than the cost of constructing a steel building.

DeBruce also compared his facility to the High Plains Grain Company facility (Bartlett), which is also located in Nebraska City. This facility was included in DeBruce's local elevator tax appraisals list. According to DeBruce, the Bartlett elevator, which also had both rail and barge loading capabilities, has a capacity of 1,080,000 bushels and an appraised value of

$451,685, for an appraised value per bushel of 41.8 cents. However, DeBruce admitted that the concrete portion of the Bartlett elevator held only 150,000 bushels and that the remainder was contained in two steel tanks. DeBruce also admitted that the Bartlett facility did not have the capability to load 25 railroad cars at once.

With respect to recent sales, DeBruce testified that he had bought four elevators over the last "couple of years" and that he paid up to 40 cents per bushel for all concrete facilities. DeBruce further testified that within the last 6 months, his company had acquired a 100-percent concrete facility in Amarillo, Texas, for 18 to 19 cents per bushel. DeBruce testified that the facility could load and unload 100-car trains in under 15 hours. DeBruce further testified that 1½ years previously he had purchased an elevator in the Texas panhandle at approximately 45 cents per bushel.

Concerning his valuation of the DeBruce Grain elevator, DeBruce testified that his price per bushel figure was 30 cents. DeBruce explained that grain elevators are not like apartment buildings or houses, in that they are not easy to find comparables for. According to DeBruce,

> Grain elevators are — don't have any of those attributes. I could probably give you an argument that the flat building is worth less than — even less than 10 cents, but that didn't seem like a reasonable approach. Is this facility worth 35 cents instead of 30 cents? Those are difficult arguments.

Dickey, the Otoe County assessor, also testified at the hearing. Dickey testified that the assessed value for improvements for 1997 was done by John Fritz of Fritz Appraisal Company under the cost approach from the Marshall-Swift manual. Dickey admitted that the records that Fritz used in arriving at the 1997 value were those maintained as part of his business as the Otoe County assessor. Dickey testified that the concrete elevator had a 50-percent depreciation level, that the drive-through had a 65-percent depreciation level, that the shower room had an 80-percent depreciation level, that the warehouse had an 80-percent depreciation level, that the barge loading facility had a 65-percent depreciation level, and that the tank had a 20-percent depreciation level. Dickey further testified that the office had

been built in 1994 and that its only depreciation involved the basement — a 50-percent level. Dickey further testified that in arriving at these values, each element of the facility was measured and recorded in the assessor's business records.

When asked whether the Marshall-Swift manual identifies specific facility economic depreciation, Dickey testified that he did not think so but stated that such was "up to the appraiser." Additionally, the following conversation took place, apparently concerning the value at which Fritz appraised the DeBruce Grain facility:

Q [DeBruce] Okay, so that was a very subjective — is it fair to say that was a very subjective number on the part of the appraiser?

A [Dickey] Well, the appraiser, and their expertise and their line, their judgment, just like it is a referee on the football field or anybody else. It's part of their business.

Dickey admitted that he does not do appraisals.

When asked why there was an increase from the 1996 valuation to the 1997 valuation, Dickey testified: "All the commercial improvements were increased 5 percent to get us into the range of — to meet the state guidelines, 92 to 100 percent." Dickey admitted that such was an across-the-board increase. Dickey further testified that the value of the DeBruce Grain facility had increased in both 1995 and 1996 due to the addition of new facilities. When asked whether it was a professionally accepted appraisal practice to consider the valuation of properties strictly based on the appraised value per bushel, Dickey testified that "it would be quite confusing."

Concerning the Bartlett elevator, Dickey testified he had personally viewed both the DeBruce Grain and the Bartlett elevators. According to Dickey, the Bartlett elevator's steel tanks were "getting quite badly rusted," and "in [Dickey's] mind, it's of a lesser condition." Dickey also testified that he did not think that the Bartlett elevator had the capacity to load multiple railroad cars simultaneously. Dickey further testified that the Bartlett facility was 15 or 16 years older than the DeBruce Grain facility.

Dickey testified that the most comparable elevators were those located in Burr and Palmyra, and he offered the property record cards of such facilities, which DeBruce objected to on

the grounds that they had not previously been made available to him. The Burr facility, which has a capacity of approximately 661,000 bushels, had an assessed value on the improvements of $368,000, for a value of 55 cents per bushel. However, Dickey testified that the Burr facility did not have any rail facilities and that such was the reason for the difference between the assessed values of the Burr and DeBruce Grain facilities. Dickey testified that the Palmyra facility had a capacity of 143,900 bushels and an assessed value of $260,000, for a total value of $1.84 (actually, $1.81) per bushel. Dickey explained that it was a newer facility and that it has not had the amount of depreciation that other facilities have had. Dickey admitted that the Palmyra facility is about 10 years newer than the DeBruce Grain facility.

With one member dissenting, the Commission concluded "as a matter of law that [the decision appealed from] was neither unreasonable nor arbitrary" and affirmed the Board's decision. In its written decision, the Commission made specific findings of fact. Excluding the formal and procedural findings, the Commission found:

IX. That the comparables chosen by the Taxpayer are not truly comparable to the subject property.

X. That the assessed value of the subject property for tax year 1997 is supported by the evidence adduced by Appellee.

XI. That no evidence has been adduced to establish that the decision of the Appellee was unreasonable or arbitrary.

DeBruce Grain now appeals.

## ASSIGNMENTS OF ERROR

DeBruce Grain contends that the Commission erred (1) in determining that the assessed value of the property for the tax year 1997 was supported by the evidence adduced by the Board; (2) in determining that no evidence had been adduced to establish that the decision of the Board was unreasonable or arbitrary; (3) in determining that the comparables chosen by DeBruce were not truly comparable to the property; and (4) in allowing the introduction of the Burr and Palmyra property record cards, when such exhibits had not been timely exchanged in advance of the hearing as required by the Com-

mission's notice of hearing pursuant to 442 Neb. Admin. Code, ch. 5, § 004.08 et seq. (1996). Our resolution of this appeal combines the first three assignments of error and renders consideration of the last one unnecessary.

## STANDARD OF REVIEW

Our review of a final decision of the Commission is for error on the record of the Commission. Neb. Rev. Stat. § 77-5019 (Supp. 1997); *Lancaster Cty. Bd. of Equal. v. Condev West, Inc.,* ante p. 319, 581 N.W.2d 452 (1998); *J.C. Penney Co. v. Lancaster Cty. Bd. of Equal.,* 6 Neb. App. 838, 578 N.W.2d 465 (1998). When reviewing an order for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Condev West, Inc., supra; J.C. Penney Co., supra.*

## ANALYSIS

### Commission's Standard of Review.

We review the Commission's decision for error on the record, but the Commission's standard of review is determined by Neb. Rev. Stat. § 77-1511 (Reissue 1996), which provides:

The . . . Commission shall hear appeals . . . as in equity and without a jury and determine anew all questions raised before the county board of equalization which relate to the liability of the property to assessment, or the amount thereof. The commission shall affirm the action taken by the board unless evidence is adduced establishing that the action of the board was unreasonable or arbitrary or unless evidence is adduced establishing that the property of the appellant is assessed too low.

### Taxpayer's Burden.

District court decisions made before the development of the Commission maintain viability now that the Commission has taken over the district court's role. *Condev West, Inc., supra; J.C. Penney Co., supra.* But before the Commission existed, the Nebraska Supreme Court announced the rule in determining whether to affirm the decision of a county board of equalization as follows:

"There is a presumption that a board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. That presumption remains until there is competent evidence to the contrary presented, and the presumption disappears when there is competent evidence adduced on appeal to the contrary. From that point forward, the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon all the evidence presented. The burden of showing such valuation to be unreasonable rests upon the taxpayer on appeal from the action of the board."

*Condev West, Inc., ante* at 329, 581 N.W.2d at 459. Accord *Ideal Basic Indus. v. Nuckolls Cty. Bd. of Equal.*, 231 Neb. 653, 437 N.W.2d 501 (1989).

Our analysis must start with the above presumption that the Board faithfully performed its duties and with the recognition that DeBruce Grain has the burden of persuasion. After several readings of the record, we are unable to find any opinion concluding that the subject property had a certain actual value, or any other opinion which would establish a basis for changing the assessed value of the subject property to some figure lower than that determined by the Board. We are not impressed with the Board's evidence, but absent valid evidence contradicting the Board's finding, the Commission and this court must give effect to the presumption.

■ We reiterate that we are not impressed with the Board's evidence. From the record, it appears that DeBruce is a forthright man, who is very knowledgeable about the grain business and the value of grain handling facilities in the Midwest. An owner of a specific type of facility, who is familiar with the facility and the value of such facility, is undoubtedly qualified to render an opinion on the fair market value of the subject property. See, generally, *US Ecology v. Boyd Cty. Bd. of Equal.*, 6 Neb. App. 956, 578 N.W.2d 877 (1998). See, also, *Johnson's Apco Oil Co. v. City of Lincoln*, 204 Neb. 397, 282 N.W.2d 592 (1979). Clearly, DeBruce is qualified to give such an opinion; however, he never rendered one. The closest he came was when he was asked, "And that is less than what you're asking for this

one to be at, or more than what you want this one to be at per bushel? What's your per bushel figure at?" And he answered, "My per bushel is about 30 cents."

■ DeBruce chose to attempt to prove the value of the subject property by showing sales and appraisals of similar property. His testimony establishes that the comparables are not really comparable, and the Commission specifically, and correctly, found that the sales and appraisals were not truly comparable. We will turn to eminent domain case law for guidance and explanation.

> We recognize that recent and comparable sales of real estate may be admissible as evidence in condemnation cases for two different purposes. They may be admitted as substantive proof of value of the condemned property or as foundation and background for an expert's opinion of value. [Citation omitted.] The rule on comparability is not as strict for foundational purposes as it is when the comparable is used as direct and independent proof of value. However, there still must be a certain degree of similarity for both purposes . . . .

*Clearwater Corp. v. City of Lincoln*, 207 Neb. 750, 754, 301 N.W.2d 328, 330 (1981).

Because DeBruce did not give an opinion of the fair market value of the property, it follows that the sales he relied upon were introduced only as independent proof of value. The evidence at best shows that the sales relied upon were of grain handling facilities. There is no testimony that the property sold in the sales relied upon were similar to the subject property, although, upon cross-examination, there is considerable testimony about differences in the various property, as well as some similarities. It would probably be difficult to establish that improved property located at a distance from the subject property is sufficiently similar to be relevant as independent evidence of value. An expert using such sales as foundation for an opinion on value can frequently explain the similarities and differences and thus use such sales as background. However, the Commission was clearly not in error when it held that the sales were not comparables for purposes of independent proof.

We point out that some of the information adduced about other grain facilities was for the purpose of showing the ass

assessed values of similar properties, rather than the sale prices of those properties. Comparing assessed values of other properties with the subject property to determine actual value has the same inherent weakness as comparing sales of other properties with the subject property. The properties must be truly comparable. Therefore, we have not considered what relevancy, if any, evidence of other assessments would possess if the other facilities were shown to be similar to the subject property.

We therefore find no error on the record and affirm the decision of the Commission.

AFFIRMED.